IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,726

In the Matter of DAVID E. HERRON II,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed May 10, 2019. Sixty-day suspension.

*Penny Moylan*, Deputy Disciplinary Administrator, argued the cause, and *Kimberly Knoll*, Deputy Disciplinary Administrator, was on the brief for the petitioner.

*David E. Herron II*, respondent, argued the cause pro se and was on the briefs.

PER CURIAM: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, David E. Herron II, of Overland Park, an attorney admitted to the practice of law in Kansas in 1993.

On August 25, 2017, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent timely filed an answer to the complaint on September 18, 2017. Prior to the filing of the formal complaint, the respondent filed a proposed probation plan on July 12, 2017; he also filed an update on the probation plan on January 30, 2018. Respondent personally appeared at the complaint hearing before a panel of the Kansas Board for Discipline of Attorneys, which was conducted on two days, November 1, 2017, and January 18, 2018.

At the conclusion of the hearing, the panel determined that respondent had violated KRPC 1.6 (2019 Kan. S. Ct. R. 302) (confidentiality); 3.3(a)(1) and (d) (2019 Kan. S. Ct. R. 350) (candor toward tribunal); 8.4(c) (2019 Kan. S. Ct. R. 387) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice). The panel set forth its findings of fact and conclusions of law, along with its recommendation on disposition, in a final hearing report, the relevant portions of which are set forth below.

"*Findings of Fact*

. . . .

"*Representation of D.J.*

"9.     The respondent represented D.J. in a pending criminal drug case. D.J. entered a plea of guilty to possession of methamphetamine. As a condition of her bond, D.J. was to remain drug free and submit to drug testing.

"10.     On July 27, 2015, D.J. appeared in court for her sentencing 30 minutes late. At the time scheduled for her sentencing hearing, two Court Services Officers believed that D.J. appeared to be under the influence of drugs because she was engaging in bizarre, jittery, and erratic behavior. At the prosecutor's request and based on her erratic conduct, D.J. was directed to report to court services and submit to urinalysis testing.

"11.     D.J. failed to provide a urine sample. Because D.J. failed to provide a urine sample, she was remanded to custody until she provided a urine sample. The court indicated that if she passed the drug test, she would be released.

"12.     After D.J. was taken into custody, the respondent had a conversation with two Court Services Officers. Amber Knapp, a Court Services Officer, memorialized her conversation with the respondent in an affidavit:

2

'On July 27, 2015, the Defendant appeared in court for sentencing. This officer spoke with Tony Cruz in regards [*sic*] to the Defendant's behavior displayed in court as well as the Defendant not following this officer's directive to contact this officer after her release from custody. When the Defendant's case was called before Judge Hornbaker at 10:55am, Mr. Cruz requested a court ordered urinalysis test. CSOII Courtney Parker stated she would observe the urinalysis test since this officer was still in court. At approximately 11:15am, CSOII Parker returned to court stating that the Defendant could not submit to the urinalysis test. Mr. Cruz stated to [*sic*] give the Defendant another ten minutes to submit to the test. At approximately 11:45am, CSOII Parker walked the Defendant back to the Court room [*sic*]. CSOII Parker notified Mr. Cruz, the Defendant was still unable to submit to a urinalysis test. The Defendant's case was then called back before the Court. Judge Hornbaker placed the Defendant in custody until she could submit to a urinalysis test and the results were to be brought to Judge Hornbaker afterwards. If the results were negative, the Defendant would be released from custody. If the results were positive, the sample is to be sent to the lab for levels and that Defendant is to have a hearing with Judge Hornbaker the following day. After the Defendant was taken into custody, the Defendant's attorney, David Herron, approached this officer and CSOII Parker and stated he is aware the Defendant is cheating her urinalysis test and has appeared in his office under the influence twice for unscheduled appointments. This officer asked the Defendant's attorney how he knows she is faking her urinalysis tests. Mr. Herron shrugged and commented that the Defendant may be having her kids pee in "little scope bottles" and then she hides the bottle in her. This officer asked Mr. Herron if the Defendant told him that and Mr. Herron shrugged.'

"13.    In an August 28, 2017, letter submitted to the disciplinary administrator's office, the respondent provided the following description of relevant facts:

3

'My client, an addict charged with a drug crime, confided in me that she knows how to beat urinalysis tests by substituting clean urine for her own. Although she denied that she committed this crime in her past, she admitted the know-how. When a judge ordered her to submit to a urinalysis test, I alerted Court Services that my client knows that urinalysis tests are beatable.

. . . .

'3.       While released on bond, [D.J.] appeared in my office on at least two occasions—one time, she appeared for a visit without an appointment. In each visit, [D.J.] appeared very jittery, jumpy, unable to sit still, and persistently rocked back and forth in her seat, and frequently flipped her hair.

'4.       During one visit, I asked [D.J.] whether she was maintaining sobriety, and she volunteered that she was clean and drug free. I suggested that she attend a local AA and/or NA group for support. I provided [D.J.] a printout of the local group meeting times.

'5.       At another visit, I praised [D.J.] for her continued sobriety, and even commented that she had consistently submitted clean urine samples. In response to my praise, she commented that urinalysis tests were easy to beat, especially in Geary County and especially for women. To wit, [D.J.] informed me that a woman can stuff a small bottle (i.e., a travel-size shampoo vial or mouthwash bottle) of clean urine into her vaginae [*sic*]. Because Geary County Court Services officers do not perform cavity searches prior to the tests, a female may drain clean urine from a bottle secreted within her vagina, thereby tricking an officer into the false belief that she had urinated.

'6.       The submission of an adulterated urine sample in response to an order entered in a pending criminal proceeding constitutes

4

interference with judicial process, contrary to KSA 21-5905(a)(5)(D), punishable as a severity level V nonperson felony. . . .

'7.     Confidentially, I asked [D.J.] whether she had submitted false urine samples while on bond in the pending case. In response, [D.J.] denied submitting adulterated samples to Geary County Court Services. Instead, [D.J.] asserted that she was clean and sober for real, and she wasn't cheating any of her tests. I admit I had my doubts about her sobriety.

'8.     On July 27, 2015 at 10:00 am, the Court called the [D.J.] matter for sentencing. D.J. was absent, so the Court agreed to re-call the matter later in the docket. [D.J.] arrived about a half-hour late and was acting noticeably bizarre. She created a disturbance as she loudly entered the crowded courtroom, sweating profusely, unable to sit still, rocking back and forth in her chair, and nervously flipping her hair. When her case was called, the State asked for a continuance of the sentencing. Tony Cruz, the assigned county attorney reviewed the Presentence Investigation Report and noted some errors in the criminal history by confusing my client with another [person by the same name]. Because of this potential for error, the State asked to continue[] the [D.J.] sentencing. [D.J.] was frustrated and visibly upset, and began to stomp her feet and pound her fists. Court services officers Amber Knapp and Courtney Parker observed [D.J.]'s behavior, and approached prosecutor Cruz in hopes of obtaining an order compelling [D.J.] to submit a urine sample. Cruz presented a request to have [D.J.] drug-tested before she leaves [*sic*] the Courthouse. Shortly before 11:00 am, Judge Stephen Hornbaker granted the State's request and required [D.J.] to submit urine for testing then return to court with the results.

'9.     As the noon hour approached, CSO Courtney Parker brought [D.J.] back before Judge Hornbaker and announced that [D.J.] failed or refused to provide a urine sample. [D.J.] explained that she urinated before court and apologized that she could not go again.

5

'10.     Despite [D.J.]'s pleas, Judge Hornbaker directed [D.J.] into custody at the jail, and ordered that [D.J.] submit a clean urine sample before being released. As the sheriff handcuffed [D.J.] and escorted her from the courtroom, she began yelling profanities, complaining that all was unfair and ". . . this is all bullshit!"

[11. Not used.]

'12.     As the courtroom cleared, I engaged Cruz in a brief conversation wherein I asked to test for drugs using blood instead of urine. Cruz commented blood testing in every case would be too costly for the County. I argued (as defense attorneys frequently do with prosecutors) that urine tests are less reliable and easier to beat then blood tests, so blood tests may end up saving money in the long run.

'13.     At this point, both CSO Knapp and CSO Parker joined in my conversation with Mr. Cruz. I responded that [D.J.], a street-smart addict, knows that a woman can cheat a urinalysis test by secreting [a] vial of clean urine within her vaginae [*sic*], then draining the vial into the collection cup. The CSOs then mentioned that they believe [D.J.]'s husband smoked pot, so his urine would test dirty for THC, but the specimens [D.J.] submitted have all been clean. I responded that [D.J.] had other options for sources of clean urine such as her children; thus, blood testing would be much more effective in testing whether [D.J.] has maintained sobriety.

'14.     Both CSO's [*sic*] expressed sincere suspicion that [D.J.] appeared in court while under the influence, due to [D.J.]'s [bizarre], jittery, and erratic behavior. In fact Knapp opined that [D.J.] was presently high on meth. I volunteered that [D.J.] appeared similarly jittery and nervous during visits to my office.

'15. Both CSO Knapp and CSO Parker then began asking pointed questions regarding whether [D.J.] cheated any of the recent urinalysis tests. At this point, I shrugged and refused to respond. The CSO's also inquired whether [D.J.] admitted to me that she had cheated. Again, I shrugged and refused to respond, then smiled and ended the conversation as politely as I could.

'16. I emphasize that [D.J.] never specifically admitted to cheating on any particular urinalysis test; rather, she conceded the know-how. Also, [D.J.] never relayed to me that she substituted her children's urine as her own. Rather, I suggested this possibility to Court Services. Additionally, I never reported to Court Services that I had direct, first-hand knowledge that [D.J.] submitted adulterated urine samples. Rather, I reported to Court Services that [D.J.] knew how to defeat urinalysis tests submitted by Geary County Court Services.'

"14. Thus, the respondent disputes Ms. Knapp's statement that he said that D.J. 'cheated' her urinalysis tests. Highly summarized, it was the respondent's position that he never told the Court Services Officers that D.J. was cheating her urinalysis tests. Rather, the respondent testified that he told the Court Services Officers that D.J. knew how to cheat her urinalysis tests.

"15. The hearing panel had the opportunity to observe both Ms. Knapp and the respondent during their testimony. Based on all of the evidence presented to the hearing panel, including Ms. Knapp's affidavit drafted contemporaneously with the events, the hearing panel accepts Ms. Knapp's version, rejects the respondent's statements and testimony on this point, and finds that the respondent told the Court Services Officers that D.J. told the respondent that she was cheating the urinalysis tests.

"16. On July 28, 2015, the respondent appeared with D.J. for a status hearing. Tony Cruz, assistant county attorney, also appeared. During the hearing, the following exchange occurred:

7

'MR. CRUZ:  Judge, if the Court will—would recall, the last time we went through this, the Court ordered [D.J.] to go directly over to court services, for a UA. She—took her half hour, hour to show up. And when she did finally show up, her behavior was so bizarre that court services believed that she had done something to alter her—her UA. She's (unintelligible); however, in the manner in which she submitted was also extremely bizarre, given the number of times that they have observe [*sic*] people submitting to UAs.

'That UA, Judge, tested negative for all—for all controlled substances. However, the Court did, in fact, find that due to the circumstances, that the Court remanded her to jail. She ended up submitting the following day, in which she tested positive for a wide variety of—of controlled substances.

'What it looks like, here, Judge, is that we're having that exact same problem again. According to—to Ms. Crump, the defendant submitted; however, there was a very small sample, and after she got dressed and somehow managed to urinate all over herself. And then, this morning they attempted again to—to get a second UA, just to—to compare with the first one, given her history. And she refused.

'I think [D.J.] has found a way to submit other people's urine for her own. And, Judge, I'm go—I'm going to ask the Court to, at least, have her submit one more, and if it's clean it's clean. But her behavior so far has been consistent with the last time, which, obviously, she had done something to doctor her urine.

'THE COURT:  Well, Jeanie Crump says that—[D.J.] says that defendant's—due to defendant's behavior and actions, this officer is concerned that urinalysis is altered in some manner or that the defendant could have used a substance that our office does not have the ability to test. So, they want to do either a—no, they—they're talking about doing a blood test or a hair follicle test too.

8

. . . .

'MR. HERRON:  Yes, your Honor. The—the history of this case is that you asked her to submit to a UA, and indeed, she did. She submitted to strip searches, they found nothing. The complaint, here, is they don't like her behavior, it is erratic, it is bizarre, it is—look at all the allegations they have, here, but what we know is that it's not erratic because she's using drugs. It's just erratic because maybe she needs some help. Okay?

'She's not on drugs. For 16 weeks she has tested clean, she tested clean again. She is—well, she's facing some very serious charges where the sentencing is, and this gal, basically, just came unglued. She's under a lot of stress[,] is acting erratic, rocking back and forth, a lot of these behaviors that they think the etiology is or the allegation of the etiology is drug use, these are behaviors that are just with somebody that's having a difficult time dealing with anxiety.

'We have—also, we dispute—greatly dispute the fact that we— the defendant refused to submit another test; but she submitted a test. She did exactly what you asked her to do. She didn't do it willingly or without putting up a stink. That is what she did. But she did what she was supposed to do. She submitted these tests.

'We'd ask that you reinstate her bond; that you find that the contempt order has been purged, by her now submitting a UA, and we're rea—be (unintelligible) ready for sentencing.

. . . .

'THE COURT:  Okay. Well, what—what's the most—what's the easiest and most concise test we can have run on her? Blood test? And quickest.

9

'UNIDENTIFIED SPEAKER:  The—well, the quickest would be another urine test, so (unintelligible)

. . . .

'THE COURT:  That isn't going to happen—

. . . .

'THE COURT:  —because she isn't going to—she isn't going to comply.

'UNIDENTIFIED SPEAKER:  There can be a blood test conducted at the hospital, with a Judge's order.

'THE DEFENDANT:  May I speak?

'THE COURT:  Well, you better talk to your lawyer, ask him whether—

'MR. HERRON:  She was just telling me that she's willing to—to—

'THE DEFENDANT:  (Unintelligible)—

'MR. HERRON:  She's willing to do a UA again, but—

'THE DEFENDANT:  Your Honor, I was willing to give a UA this morning. They pulled me out of my cell at 7:45, with my cup of water, put me in a cell with no women at all. I—I did the strip search, and yes, I was—I was—I was very upset because I had to pull parts of my body apart that I've never had to do before. So, I was pretty upset by that. But I can give another UA. I—(unintelligible)—I've been telling my

10

attorney this is the longest I've been clean since I was in prison. This is a big deal to me. I've done my—

. . . .

'THE COURT: Okay. Le—le—I'm giving you a chance to prove that. Take it. Give another UA by noon. If you don't have a—a good, clean UA, that's verified to be—to be accurate by noon, then I'm going to order that she be taken to the—the hospital and have a blood test—and submit to a blood test. All right?

'THE DEFENDANT: Your Honor.

'THE COURT: You've got till noon.

'THE DEFENDANT: When it comes back clean, do I get to leave?

'THE COURT: Yep.'

"*Representation of R.B.*

"17.     The respondent represented R.B. in a criminal case. The case was scheduled for sentencing in front of the Honorable Maritza Segarra on August 20, 2015, at 1:30 p.m. At that time, R.B. failed to appear and Judge Segarra issued a bench warrant.

"18.     After the respondent returned to his office, R.B. came to the respondent's office. The respondent and R.B. went to Judge Segarra's chambers to see if the judge would have time to take up the case again now that R.B. was present. Van Printy, Judge Segarra's assistant, told the respondent that he thought Judge Segarra would have time to take up the matter again.

11

"19.    The respondent attempted to locate Mr. Cruz, the assistant county attorney assigned to R.B.'s case, in another court division. Unfortunately, Mr. Cruz had already completed his cases and had returned to his office.

"20.    The respondent and R.B. went to the County Attorney's office and asked to speak with Mr. Cruz. The front desk attendant asked Mr. Cruz whether he would speak to the respondent and Mr. Cruz told the front desk attendant that he was too busy working on a motion to speak with the respondent at that time.

"21.    After the respondent was told that Mr. Cruz was too busy to see him, the respondent asked the front desk attendant to take a note to Mr. Cruz. The attendant provided the note to Mr. Cruz. The note provided:

> '[R.B.] SHOWED UP ABOUT 20 MIN LATE
> I will surrender him. NO OBJECTION TO re-setting.?
> N [*sic*]
> If there is, CALL VAN CHAMBERS'

Because he was working on a motion, Mr. Cruz did not immediately read the respondent's note.

"22.    When the respondent stated that he was going to surrender his client, he meant that he was taking his client to the court to attempt to get the warrant recalled and to get the sentencing rescheduled. When asked what surrender means to him, the respondent testified, 'I've used it numerous times to mean my client has a warrant, I will voluntary surrender and bring him in to the judge.' The respondent also testified:

> '. . . I'm surrendering him. You don't need to send out your army of minions. I'm surrendering to your authority and bringing him to you. That's what surrender means. I'll do it without a fight. I'll do it without being jailed. I'll do it voluntarily. I will surrender to your authority and bring you—bring my client before you, 'cause that's what a warrant is compelling, is my appearance before this judge.'

12

"23.     After Mr. Cruz read the respondent's note, he did not understand it to mean that the respondent was attempting to get before the court. Rather, Mr. Cruz testified that to him the word surrender means to surrender to the jail, 'surrendering means taking him over to jail, we didn't surrender defendants back to the Court.'

"24.     Unbeknownst to Mr. Cruz, the respondent and R.B. returned to Judge Segarra's courtroom. According to a transcript of this matter, the following transpired:

'MR. HERRON:  In case number 2014 664, I'm presenting [R.B.] We—this matter was set for sentencing this afternoon at 1:30. [R.B.] incurred transportation difficulty and car trouble on his way here from Manhattan.

'I'll represent to you that I'm at my office. Shortly before 2 o'clock, he comes knocking on the door saying, Mr. Herron, I'm so sorry, my problem was, I missed court because my transportation failed me, here I am. I let him know that there was a warrant out for him, so I am here to surrender, and hopefully before it heads on over to the sheriff's office.

'I'll also represent to you, Judge, I hustled on over to Division 2 where I thought Mr. Cruz might be, or courtroom 2. He had already returned to his office; he was there. He declined to come here today, saying, wait a minute, if you can get me on the phone, fine, but I'm not coming to court to try to redo the sentencing. My impression is, there would be no objection from the State to just resetting the matter. And becau—

. . . .

'THE COURT:  The Court can take this up August 24th at 9 o'clock.

13

'MR. HERRON: And as a courtesy to Mr. Cruz, Judge, is that a date when—when Tony is already here?

'THE COURT: I don't know. That's when I'm setting it on my docket.

. . . .

'THE COURT: So, [R.B.], I'm going withdraw the warrant. I'm going to reinstate the old bond under the same terms and conditions. And, sir, I suggest you get here early that day.

. . . .

'THE COURT: Mr. Herron, do the—

'MR. HERRON: Journal Entry?

'THE COURT: —journal entry, if you would.

'MR. HERRON: And I certainly will call Mr. Cruz immediately and let him know—'

(During the hearing on the formal complaint, respondent testified that he believed the phrase 'wait a minute' was not stated by him even though it was attributed to him in the transcript above.)

"25. Following these proceedings, the respondent and Mr. Cruz engaged in an email conversation, as follows:

a. On August 20, 2015, at 3:20 p.m., the respondent wrote to Mr. Cruz: 'Tony, Judge quashed the warrant and re-set the sentencing for 08.24.2015 at 9 am. Call Van in chambers if this setting presents a problem.'

14

b.      On August 20, 2015, at 3:38 p.m., Mr. Cruz wrote to the respondent: 'And how exactly did that happen?'

c.      On August 20, 2015, at 5:10 p.m., the respondent wrote to Mr. Cruz:

'Oh! I stopped by your office and let ya'll know that [R.B.] came by my office—evidently his car broke down (and/or other transportation problems) coming from Manhaattan [*sic*]—at about 2:15 pm or so. We came to get you because Van let me know that judge would be on [*sic*] bench from 2:30-2:45 doing a default divorce. I swung by your office and asked if you could attend, or be available by phone. So at about 2:45 or so, once [*sic*] divorce was done, I presented [R.B.] and surrendered to the warrant, and judge recalled/quashed the warrant, wagged her finger at [R.B.], and re-set the matter.

'Like the resurrection of dry bones dancing to the tambourine, setting aside the warrant was a miracle.

'See you at 9am on Monday to finalize the [R.B.] case.'

d.      On August 20, 2015, at 5:13 p.m., Mr. Cruz wrote to the respondent: 'Your recollection of events differs from that of my staff. So I guess we'll see on Monday.'

e.      On August 21, 2015, at 7:37 a.m., the respondent wrote to Mr. Cruz: 'Tony, At the conclusion of yesterday's hearing, Judge S asked me to draw up a JE of yesterday's shenanigans. I plan to drop the attached off at chambers this morning. Call Van if the State has any objection to this.'

f.      On August 21, 2015, at 7:56 a.m., Mr. Cruz wrote to the respondent:

'Yeah, I have an objection. You never advised our office you intended on going back to court. You merely asked if i [*sic*] was available tobtalk [*sic*] to you. As o [*sic*] was in the muddle [*sic*] if [*sic*]

15

draftibg [*sic*] motions, i [*sic*] was not. If you represented to the court you advised our ifgice [*sic*] you were going back to court, that is a flat out lie.

'When someone says they are going to surrender themselves due to an activecwarrant [*sic*], that means they are going to the jail. No one turns themselves in to the court.

'I am getting tired of these ex parte communications, which are unethical.'

g.      On August 21, 2015, at 8:18 a.m., the respondent wrote to Mr. Cruz:

'Aw c'mon, I tried to get your attn. I even came by your place in person but the experience reminded me of hollering at my older daughter's closed bedroom door. My little daughter would be the first to announce that you're being a poopie pants. Let's just change our pants and meetup [*sic*] on Monday morn at 9am. If you keep poopie pants on too long you start to walk funny after a while.'

"26.    In the midst of the email conversation with the respondent, Mr. Cruz sent an email message to Larry McRell, the Chief Public Defender and the respondent's supervisor, which provided:

'Mr. Herron and I were scheduled for a sentencing in front of Judge Segarra at 1:30 on [R.B.] [R.B.] failed to appear and Judge Segarra issued a bench warrant. I had cases in front of Judge Zimmerman and I went back to courtroom 2 and finished my cases. Sometime after I had returned to the office, Mr. Herron stopped by unannounced and wanted to talk to me. As I was in the middle of drafting motions, I advised the front desk secretary, Julie to advise Mr. Herron I was [*sic*] could not see him. A short time later Julie, left a note on my desk, but I did not read it as I was in the middle of drafting motions. A short time later, I was buzzed by my secretary indicating that Judge Segarra's clerk had just entered a new date on [R.B.]'s case. I had her buzz district court to see

16

what was up and according to Vann [*sic*], Mr. Herron advised the court I refused to go back to court, which is obviously not true. I checked with Julie to see what she advised him and she advised she told Mr. Herron that I would not talk to him as I was in the middle of drafting motions. No one ever asked me to go back to court, nor did I acquiesce to him having ex parte contact with the court. I will find out what he said to Van, and if he lied to Judge Segarra, I am reporting him. There was never a request or notice that the court wanted to take the matter up again. I am getting tired of this guy's antics.

'Thanks,

'Tony

'P.S. Herron left a note indicating he was going to surrender [R.B.] ASAP. How does that equate to taking the matter backup [*sic*] with the judge without any notice?'

"27.    On August 21, 2015, Mr. Cruz sent an email message to Van Printy who works in Judge Segarra's chambers, which provided:

'Just FYI, Mr. Herron never advised our office he planned on returning to court with [R.B.] Any representations to that effect, are a lie. He stopped by our office to see if I was available to talk to him. He was advised I was not 1, [*sic*] as I was drafting motions. The next thing I know, it's set for Monday. I have already informed Larry McRell. I'm getting tired of this guy's ex parte communication with judge's chambers.'

Mr. Printy responded, 'Well then he lied to the court on the record. He told the court that when he spoke with you, you weren't coming back over to court and you inferred that you didn't object to the BW being withdrawn.'

17

"28.     The respondent provided the judge with a proposed journal entry. The proposed journal entry included the following:

'. . . At approximately 2:10 pm, the Defendant reportedly appeared at the Public Defender's Office. Defense counsel reported that he personally informed the prosecution that [R.B.] intends to surrender himself to the Court and request that the newly-issued warrant be recalled and sentencing rescheduled. Although defense counsel requested a prosecutor to be present for an impromptu hearing, none was available.

'At approximately 2:45 pm, [R.B.] appeared before this Court personally and with counsel, requesting that the Court recall and/or quash the orders announced from the bench approximately an hour earlier.'

The court signed the journal entry as drafted by the respondent.

"29.     On August 24, 2015, Larry McRell terminated the respondent's employment with the public defender's office.

"*Disciplinary Investigation*

"30.     On August 25, 2015, Mr. McRell filed a complaint with the disciplinary administrator's office regarding the respondent's conduct in these cases. Mr. McRell included a letter written by the respondent, dated August 2, 2015, addressed to the disciplinary administrator. The August 2, 2015, letter, however, was a draft and was not finalized by the respondent and the respondent never signed nor sent the August 2, 2015, letter.

"31.     Rather, on August 28, 2015, the respondent submitted a letter to the disciplinary administrator's office which varied from the August 2, 2015, draft.

"32.     During the hearing on this matter, the respondent testified about the two self-report letters:

18

'Q.     Going back to the very first paragraph of that same letter.

'A.     Yes.

'Q.     "In accord with my duty to report potential violations of the Rules of Professional Conduct, please consider the information below." Did you write that sentence?

'A.     Yes.

'Q.     Then on the very beginning of the second paragraph it says, "both of these violations occurred in the course of my representation of [D.J.] against charges that she distributed controlled substances." Did you write that sentence?

'A.     I know that I wrote most of that. I think I included alleged violations, just like I wanted to use alleged or potential violations, because I used it in the first sentence. That might be edited out. Both of these violations, but I adamantly agreed that I did these things, but are they violations. And I don't want to be seen as uncooperative or trying to be obstreperous. I think—I know I did that. I know I talked to those court services officers, but I don't think it was a violation. So I would have said it's a potential violation or an alleged violation, 'cause, frankly, I think I had reason to make that disclosure. Larry McRell was reading this. He basically told me that being contrite and being apologetic is going to be key to you keeping this job, because I'm leaving in 30 days and I'll take you with me is what he said, and I was terrified of that.

19

'Q.     Here's—here's my follow-up question then, this letter clearly looks like you're self-reporting some violations to Stan Hazlett. Would you agree with that?

'A.     Of course. Yes.

'Q.     Did—did you intend to present that to Mr. Hazlett knowing those were false—

'A.     No.

'Q.     —knowing that you didn't really think that you had done anything wrong because you were trying to protect your job?

'A.     I was hopeful, sir, at this point—no—the answer is no, I didn't think they were false. I was hopeful Larry would see what really happened and say, oh, there's no violation. You're good. I was hoping against hope and praying on my knees that's what would happen with this letter on August 2nd. And it didn't happen. Then when I got the can and I heard everybody calling and telling me Larry's filed a bar complaint and he plans to, that's why I went and did it myself. I thought it would be better if it came from me than someone else. Jud actually told me Larry had me type up and finish up his bar complaint, he's mailing in. So that's why I went ahead and self-reported. I figured if they get it from me first, maybe it will take the sting out of it. Plus what I really wanted was my job back. I loved that damn job.

'Q.     You say you self-reported, did this letter ever get transmitted to Mr. Hazlett?

'A.     No, I don't think so. Well, Larry McRell did send it, yes.

'Q.     How did you self-report?

20

'A.     I did have a self-report, sir. That was a second Exhibit.

'Q.     Okay.

'A.     I'll show it to you. It's—

        'MR. HERRON:  Ms. Knoll, do you have it?

'A.     Because I know [I] wrote a letter on my own letterhead. Here it is.

        'MS. KNOLL:  It's Exhibit 3, chairperson.

'A.     Yes. This is the letterhead if I typed something up myself I would use. Okay. That is Exhibit 3. And you notice how the first sentence is very similar, that's what I—because I remember a sentence or two. In accord with my responsibility to self-report a potential violation. I am unsure whether my conduct constitutes a violation. That's what this Exhibit 3 says. This one is genuine, it's a hundred percent dead on. This is what I read. And so I was thinking, perhaps in hindsight it's obviously wrong, that if they got this and they saw my side of the story, there's nothing here. That's what I was hoping. Or maybe they'd send me one of those letters saying, Mr. Herron, you're to[e]ing the line, would you cut it out. Here's a warning letter. I was hoping I would get something like that. But instead, two and a half years later I'm arguing about these things.

'Q.     Okay.

'A.     That's really what the difference is. But, yes, I wrote Exhibit 3. That is dead on right. That's the right copy. The Exhibit that Mr.

21

McRell attached was something we had e-mailed back and forth about, 'um.'

It is clear to the hearing panel that the respondent drafted the August 2, 2015, letter in an attempt to keep his job with the public defender's office. However, because he was fired before he self-reported his conduct, the respondent made further edits before mailing the self-report letter on August 28, 2015.

"*Conclusions of Law*

"33.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated Rules 1.6 (confidentiality), 3.3 (candor to the tribunal), 8.4(c) (professional misconduct involving dishonesty), and 8.4(d) (professional misconduct prejudicial to the administration of justice). The hearing panel concludes that clear and convincing evidence was not presented to establish that the respondent violated Rules 1.1 (competence) and 3.5 (decorum of the tribunal).

"Rule 1.6 Confidentiality

"34.    Rule 1.6(a) provides:

'A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).'

Much was made at the hearing by the respondent about whether he told the Court Services Officers that D.J. cheated on the tests or that he told the Court Services Officers that D.J. knew how to cheat on the tests. As stated above, the hearing panel accepted Ms. Knapp's statements and testimony and rejected the respondent's statements and testimony. However, whether the respondent told the Court Services Officers that D.J. cheated the tests or knew how to cheat the tests is not material for our purposes. The question is whether the respondent disclosed confidential information without authority. D.J.'s

22

statement that either she cheated on the tests or knew how to cheat on the tests was confidential information which the respondent obtained during his representation of her.

"35.    The respondent argued that his disclosure was impliedly authorized in order to carry out the representation. The respondent's argument lacks merit. Comment 6 describes what is 'impliedly authorized in order to carry out the representation.'

'A lawyer is impliedly authorized to make disclosures about a client when appropriate in carrying out the representation, except to the extent that the client's instructions or special circumstances limit that authority. In litigation, for example, a lawyer may disclose information by admitting a fact that cannot properly be disputed, or in negotiation by making a disclosure that facilitates a satisfactory conclusion.'

In this case, there is nothing about the respondent's disclosure that assisted in carrying out the representation. Because the respondent's disclosure was not authorized, the hearing panel concludes that the respondent disclosed confidential information in violation of Rule 1.6(a).

"36.    It is worth noting that in the respondent's draft letter dated August 2, 2015, the respondent admitted that he revealed confidences that he should have kept to himself. The respondent confirmed during the hearing that those were his words. However, the respondent drafted that letter in an attempt to keep his job at the public defender's office and did not submit that letter to the disciplinary administrator's office.

"Rule 3.3 Candor to the Tribunal

"37.    The foundation of the practice of law is truth. Attorneys must be honest in all they do, particularly in appearances before courts. 'A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.' Rule 3.3(a)(1). Additionally, '[i]n an ex parte proceeding, a lawyer shall inform the tribunal of all

23

material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.' Rule 3.3(d).

"38.     Contrary to the respondent's statement to the district court that D.J. was not on drugs and had tested clean for 16 weeks, other evidence, including evidence presented by the respondent, establishes that the respondent knew that D.J. had been using drugs and had not tested clean for 16 weeks.

a.     On May 15, 2015, Ms. Knapp filed an affidavit to revoke D.J.'s bond. In the affidavit, Ms. Knapp asserted that that same day D.J. tested positive for amphetamine, methamphetamine, marijuana, and opiates/morphine. Ms. Knapp also stated that D.J. admitted to using an unknown substance on a spoon on May 7, 2015.

b.     When D.J. was evaluated by a substance use therapist, D.J. admitted to using opioids on May 17, 2015, and methamphetamine on April 20, 2015, both within 16 weeks prior to the respondent's statement on July 28, 2015. The evaluation was filed in D.J.'s case in June, 2015.

c.     In the respondent's August 2, 2015, draft letter to the disciplinary administrator, the respondent stated '. . . [D.J.] appeared to be under the influence at the time.'

d.     In that same letter, the respondent stated:

'. . . I had a brief conversation with the spouse of my client. [D.J.'s husband] admitted he didn't know for sure whether [D.J.] would test clean, but [D.J.'s husband] had no reason to believe that [D.J.] may have broken sobriety by using meth while on bond pending sentencing.

. . . .

24

'I suspected that [D.J.] was cheating the system by bringing clean urine to the testing room. Admittedly, [D.J.] confided in me that she generally knows how to beat the system by bringing another's urine with her.'

e.      Also, in his August 31, 2015, letter to the disciplinary administrator, the respondent stated 'three days later, [D.J.] posted bond and [D.J.] submitted samples that tested positive for the presence of marijuana, opiates/morphine, amphetamine and methamphetamine.'

f.      In the respondent's September 11, 2015, letter to the disciplinary administrator's office, the respondent stated '[o]n or about May 15, 2015 [D.J.] tested positive for opiates, marijuana, amphetamine and methamphetamine.'

g.      During his closing argument in the instant case, the respondent made unusual comments regarding his client, including a comment that he knew she cheated on the urinalysis tests:

'I was deeply troubled by what I thought was awful behavior, but also I'll admit to all three of you, I think she was being a little dramatic. Okay. I think [D.J.], maybe she had it coming and deserved that type of treatment, and maybe she was overstating it, and that was in the back of my mind, too, but I was also thinking what if this really was a sexual assault and she's just torn apart and going—and reacting like this. Why shouldn't I stand up for her the best I can? Why shouldn't I think of a way to cut it out? And the only way to get them to cut it out is to meet them where they are. They know she cheats, so do I. That was my strategy. Again, was it selfish to do that? No.'

Clearly, the respondent knew that [DJ] was not clean and had not tested clean for 16 weeks. Thus, the statements the respondent made to the court were dishonest.

25

"39.     The respondent also violated Rule 3.3 in his representation of R.B.

"40.     The respondent led the court to believe that Mr. Cruz declined to come to court. Mr. Cruz did not decline to come to court; Mr. Cruz did not know the respondent was returning to court. Also, the respondent failed to inform the court of all material facts known to him. He failed to inform the court that he had not spoken to Mr. Cruz. He did not inform the court that he did not know whether or not Mr. Cruz would object to the recall of the warrant. Thus, the hearing panel concludes that the respondent violated Rule 3.3(a)(1) and Rule 3.3(d) when he provided false information to the court.

"Rule 8.4(c) Professional Misconduct Involving Dishonesty

"41.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' Rule 8.4(c). The respondent engaged in conduct that involved dishonesty when he told the court that D.J. had not been using drugs and had tested clean for 16 weeks. The respondent also engaged in conduct that involved dishonesty when he told the court that Mr. Cruz declined to come to court in R.B.'s case. Finally, the respondent engaged in conduct that involved dishonesty when he drafted the journal entry in R.B.'s case which stated that he 'personally informed the prosecution that [R.B.] intend[ed] to surrender himself to the Court and request that the newly-issued warrant be recalled and sentencing rescheduled.' As such, the hearing panel concludes that the respondent violated Rule 8.4(c).

"Rule 8.4(d) Professional Misconduct Prejudicial to the Administration of Justice

"42.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' Rule 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice when he submitted a journal entry which contained inaccurate and false information. As such, the hearing panel concludes that the respondent violated Rule 8.4(d).

26

"43.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"44.     *Duty Violated*. The respondent violated his duty to his client to keep confidences. Additionally, the respondent violated his duty to the public to maintain his personal integrity. Finally, the respondent violated his duty to the legal profession to refrain from engaging in conduct that is prejudicial to the administration of justice.

"45.     *Mental State*. The respondent knowingly violated his duties.

"46.     *Injury*. The injury to D.J. caused by the respondent is a significant factor to consider. According to the respondent, D.J. made statements to him that it is easy to beat the urinalysis tests. The respondent described D.J.'s statements as follows:

'5.     At another visit, I praised [D.J.] for her continued sobriety, and even commented that she had consistently submitted clean urine samples. In response to my praise, she commented that urinalysis tests were easy to beat, especially in Geary County and especially for women. To wit, [D.J.] informed me that a woman can stuff a small bottle (i.e., a travel-size shampoo vial or mouthwash bottle) of clean urine into her vagina. Because Geary County Court Services officers do not perform cavity searches prior to the tests, a female may drain clean urine from a bottle secreted within her vagina, thereby tricking an officer into the false belief that she had urinated.'

After the respondent disclosed D.J.'s statements to the Court Services Officers, the Court Services Officers subjected D.J. to strip searches and cavity searches. It is reasonable to conclude that the Court Services Officers began conducting strip searches and cavity searches on D.J. because of the respondent's disclosure of D.J.'s statements.

"47.    *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

a.      Prior Disciplinary Offenses. In 2014, the respondent participated in the attorney diversion program for having violated Rule 1.4 (communication) relating to a complaint filed in 2009.

b.      Dishonest Motive. The respondent was deceptive in his representation of D.J. and R.B.

"The respondent argued that D.J. had tested clean for 16 weeks. However, the respondent was aware that D.J. had tested positive for drugs during the preceding weeks.

"Additionally, when the respondent appeared before the court with R.B., the respondent told the judge that Mr. Cruz declined to come to court. Mr. Cruz did not decline to come to court; rather, Mr. Cruz did not understand that the respondent was returning to court with R.B. Also, in the journal entry, the respondent indicated that he 'personally informed the prosecution that [R.B.] intend[ed] to surrender himself to the Court and request that the newly-issued warrant be recalled.' The respondent's note did not indicate that the surrender was going to be made to the court. Likewise, the respondent's note to Mr. Cruz did not indicate that he was seeking to have the warrant recalled.

"The hearing panel concludes that the respondent's misconduct was motivated by dishonesty.

28

c.        Multiple Offenses. The respondent committed multiple rule violations. The respondent violated Rules 1.6 (confidentiality), 3.3 (candor to the tribunal), 8.4(c) (professional misconduct involving dishonesty), and 8.4(d) (professional misconduct prejudicial to the administration of justice). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

d.        Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process. At the hearing on the formal complaint, the respondent testified as follows:

        'BY MR. LARSON:

        'Q.        And you drafted this original journal entry. Is that correct?

        'A.        Yes . . .

        . . . .

        'Q.        All right. I want you to look at the—it would be the third
                paragraph, first two paragraphs are very short.

        'A.        Yes.

        'Q.        Third paragraph, about half way down it says, "defense counsel
                reported he personally informed the prosecution that [R.B.]
                intends to surrender himself to the court and requests that the
                newly issued warrant be recalled and sentencing be
                rescheduled." Did you draft that?

        'A.        Oh, yes. I wrote this.

        'Q.        Can you point to any place in the record where you informed the
                prosecutor that you were going to request that the newly issued
                warrant be recalled?

29

'A.    That's when I went over personally to their office and was saying to Julie Rose, to the prosecution, I'm here, we're going right back to court right away. That's—that's where that happened.

The only compelling evidence presented regarding what was communicated to Mr. Cruz was the note penned by the respondent and delivered to Mr. Cruz. The respondent's note is void of any reference of notice that he was surrendering R.B. to the court and was seeking to have the bench warrant recalled.'

"On October 26, 2017, the respondent filed a document titled 'evidence in mitigation.' In that document the respondent states:

'1.    Absence of Prior Disciplinary Record. The Complaint filed herein by the Disciplinary Administrator represents the first time a Complaint has been filed against the Respondent; Respondent was sworn in by the Supreme Court in April 1993.'

While this case represents the first time a formal complaint has been filed against the respondent and the first time the respondent has appeared for hearing before the Kansas Board for Discipline of Attorneys, a previous disciplinary complaint was filed against respondent. According to Exhibit 7, on September 10, 2009, J.B. filed a complaint against the respondent. That case was resolved by the respondent's participation in the attorney diversion program. The respondent's statement in his pleading is misleading. If the respondent intended his statement in his pleading to relate only to formal complaints, then the respondent should have so indicated.

"The respondent's statement in his pleading is a good example of one of the respondent's main difficulties:  rather than be accurate, clear, and complete, the respondent provides only a portion of information. Then, when others challenge the accuracy of his statements, he expresses surprise and indignation. One example can be found during the respondent's closing argument:

30

'I always want to—I was almost insulted Mrs. Knoll, when you said you think I've tried to mislead in this proceeding. I've been as transparent as I possibly can. Where I think I've come close to the line, I've admitted it. I still, to this day, will go to my grave, I promise you, thinking how did you find these violations, I totally disagree, but I'm willing to accept whatever it is you want to hand down.'

e. Refusal to Acknowledge Wrongful Nature of Conduct. The respondent refused to acknowledge that he engaged in misconduct. However, the hearing panel is mindful of the respondent's argument that he is permitted to make a rigorous defense. The hearing panel is called on to consider the ABA Standards for Imposing Lawyer Sanctions, including the aggravating and mitigating factors set forth in Standard 9.0. *See In re Keithley*, 252 Kan. 1053, 850 P.2d 227 (1993) ('In assessing discipline, aggravating and mitigating factors are to be considered. See *In re Kershner*, 250 Kan. 383, 391, 827 P.2d 1189 (1992); ABA Standards for Imposing Lawyer Sanctions (1991) (hereinafter Standards).') As such, the hearing panel has considered this factor [and] concludes that the respondent did not acknowledge his wrongdoing. Because the hearing panel is persuaded by the respondent's argument, however, the hearing panel is not relying on this factor in making its recommendation for discipline.

f. Vulnerability of Victim. D.J. was vulnerable to the respondent's misconduct.

g. Substantial Experience in the Practice of Law. The Supreme Court admitted the respondent to practice law in the State of Kansas in 1993. At the time of the misconduct, the respondent had been practicing law for more than 20 years.

"48. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a. Absence of Selfish Motive. While the hearing panel concluded that the respondent's misconduct was motivated by dishonesty, the hearing panel also concludes

31

that the respondent's misconduct was not motivated by selfishness. The respondent receive[d] no personal benefit as a result of his misconduct.

b. <u>The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions</u>. While the respondent met with the investigator and promptly and timely responded to requests, the respondent did not acknowledge his transgressions. Thus, this factor in mitigation only partially applies.

c. <u>Imposition of Other Penalties or Sanctions</u>. As a result of the respondent's misconduct, he was fired from his position in the public defender's office.

d. <u>Remoteness of Prior Offenses</u>. The respondent's misconduct that gave rise to his participation in the attorney diversion program is remote in character and in time to the misconduct in this case.

"49. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.22 Suspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client.

'6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a

32

professional, and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation*

"50.    The deputy disciplinary administrator recommended that the respondent be disbarred.

"51.    Prior to the time the deputy disciplinary administrator filed the formal complaint in this case, the respondent filed a proposed probation plan. At the hearing on the formal complaint, however, the respondent argued the probation was unnecessary and he requested an admonition or reprimand.

'. . . I'm more than willing to put a reprimand in my file or an admonition letter. I'm also more than willing to enter another diversion agreement or probation type of situation with you.

'However, I admit that since this happened to that [*sic*] me I've been watching the Supremes on YouTube a lot, and watch the Supreme Court in concert, whatever, okay, and I'm watching them, and one of the comments was tailoring probation plans to prevent underlying problems.

. . . .

'. . . The probation plan didn't seem to fit, but I—I was more than willing to do that if it would make folks happy for me to meet with—with Paul.

. . . .

'I would like to ensure the Panel that I don't think probation is necessarily. [*sic*] I'm willing to do it, but I don't think it's one of those situations in which it really will help. I don't think it is.

. . . .

'. . . I'm asking that you enter a private admonition like a warning or a reprimand. I will do probation if you ask me to, but I don't think it's going to be very helpful, and find that I have endured a lot of loss already that's way—very significant for me and my family and the hardship I've endured, even now, . . .

. . . .

'I'm asking that we all—we all agree to enter that private admonition and close this case now rather than make me come back and do probation for awhile.

'Also, I think both—I hope we all feel this way, did I do anything willfully harmful. If somebody was hurt, did I mean it. Does anybody think that? Hearing no response, I'm guessing we all agree, no. Thank you.'

"52.     Even though the respondent does not believe that probation is necessary, in full consideration of this case, the hearing panel turns its attention to Kan. Sup. Ct. R. 211(g)(3):

'The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)      the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)     the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

34

(iii)    the misconduct can be corrected by probation; and

(iv)    placing the Respondent on probation is in the best interests of the
legal profession and the citizens of the State of Kansas.'

The respondent developed a timely plan of probation. However, he failed to put it into effect prior to the hearing on the formal complaint. Additionally, the misconduct in this case cannot be corrected by probation. In *In re Stockwell,* 296 Kan. 860, 868 (2013), our Supreme Court stated, 'this court is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts.' Finally, placing the respondent on probation is not in the best interests of the legal profession and the citizens of the State of Kansas. Accordingly, the hearing panel does not recommend that the respondent be placed on probation.

"53.    The hearing panel has carefully considered all of the evidence presented at the hearing in this matter. The respondent's misconduct is serious and includes dishonest conduct. Further, the injury that D.J. suffered as a result of the respondent's disclosure of client confidences cannot be undone.

"54.    The hearing panel concludes that some time away from the practice of law would benefit the respondent as well as the citizens of the State of Kansas. Thus, based on all of the evidence, the hearing panel recommends that the Supreme Court suspend respondent's license to practice law for a period of 30 days.

"55.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of

the KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2019 Kan. S. Ct. R. 257). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint to which he filed an answer; he was given adequate notice of the hearing before the panel at which he appeared, pro se; and he was given adequate notice of the hearing before this court at which he appeared, pro se. After the panel's final hearing report, Respondent filed 37 paragraphs of exceptions, as well as a brief and a reply brief to the Disciplinary Administrator's responsive brief. The exceptions challenged specific factual findings in the panel's report, and disagreed with the panel's characterization of the evidence and its conclusions regarding rules violations. Cf. *In re Hodge*, 307 Kan. 170, 210, 407 P.3d 613 (2017) (Respondent's "enumerated 27 paragraphs of specific exceptions to the panel report . . . fall into two broader categories:  (1) those relating to specific factual statements in the panel report and (2) disagreements with the panel's characterizations of the evidence, as well as the panel's conclusions and findings of rule violations.").

When respondent takes exception to a panel finding, this court must determine whether the disputed finding is supported by clear and convincing evidence. *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008). But when making that determination, we do not weigh conflicting evidence or assess witness credibility. *In re Kline*, 298 Kan. 96, 113-14, 311 P.3d 321 (2013). "If a disputed finding is supported by clear and convincing evidence, it will not be disturbed." *Hodge*, 307 Kan. at 210.

*Representation of D.J.*

Before addressing specific exceptions, we pause to dispel respondent's recurring argument that, because D.J. confessed to cheating on the May 5, 2015 urinalysis, he was permitted to reveal her confidential communication that she knew how to cheat on such testing and that described the manner of concealing "clean" urine. That argument is fallacious, both factually and legally.

To recall, D.J. took a urinalysis that was negative for any controlled substance on May 5, before being arrested on a warrant. On May 7, after D.J. had been incarcerated for two days, a court-ordered urinalysis tested positive for amphetamines, methamphetamine, THC, and opiates/morphine. On the testing form, D.J. voluntarily admitted to using THC on April 20, opiates on May 4, and "meth" on May 3. Pointedly, D.J. did not confess to cheating on the May 5 test, nor did she describe the manner in which she effected a clean result. Granted, the disparate test results and subsequent confession to drug use might imply that D.J. did something to influence the first test, rather than there simply being a failure of testing protocol. But the confidential communication revealed by respondent went well beyond that implication, filling in the manner in which the test could be cheated. In other words, respondent revealed more than his client had admitted.

More fundamentally, however, such an unrepresented confession to a third-party is not an exception that allows a lawyer to reveal confidential communications without the client's informed consent. If that were so, many criminal defendants would be unable to have a confidential communication with his or her attorney after making inculpatory statements to law enforcement and the rationale behind the rule would be eviscerated. In short, respondent's "client confession" defense to violating KRPC 1.6(a) is unavailing.

37

Turning to specific exceptions, respondent quibbles with the panel's finding in paragraph 9 that he "represented D.J. in a pending criminal drug case." He points out that there were actually two drug cases, one of which was dismissed pursuant to a plea agreement in the other. While respondent is technically correct that the panel's factual finding could have been more complete, the shortcoming is immaterial to our review.

With respect to the paragraph 12 finding, which recites the affidavit of the court services officer (CSO) to whom respondent revealed client confidences, the respondent complains about the content of the affidavit being incomplete and inaccurate. But the panel accurately quotes the affidavit that is in the record, i.e., the finding is supported by clear and convincing evidence. Moreover, we will not reassess the panel's credibility determination relative to this evidence.

The panel's paragraph 13 describes a letter submitted to the disciplinary administrator's office in which respondent provides his version of events with respect to his representation of D.J. The panel incorrectly described the letter as being dated in 2017, rather than August 28, 2015. Otherwise, the finding is supported by clear and convincing evidence. Respondent's "client confession" defense has no bearing on this finding.

For his exceptions to the panel's findings in paragraphs 14 and 15, respondent relies on the misguided notion that the disparity in the May 5 and May 7 test results, with accompanying confession of drug use, permitted respondent to disclose later confidential communications with his client. We have already explained why he is mistaken in his belief that a third-person disclosure is an exception to an attorney's duty of confidentiality. The findings in both paragraphs are supported by clear and convincing evidence.

38

The finding in paragraph 16 quotes the transcript of a portion of D.J.'s July 28, 2015, status hearing. Respondent complains that there was nothing unintelligible about what was said at the hearing and that some of the testimony was pure speculation, but that is not the point. The panel accurately quotes the transcript that is contained in the record. Additionally, respondent asserts that he mistakenly stated the number of weeks D.J. had been drug-free and that he did not knowingly misdirect the court. While that argument is germane to the conclusion to be drawn from his statements at the hearing, it does not refute that there is clear and convincing evidence that he actually made the statement.

*Representation of R.B.*

Respondent takes exception to the panel's statement in paragraph 17 that "Judge Segarra issued a bench warrant" when R.B. failed to appear for sentencing. He contends that, given no journal entry in the record reciting that a bench warrant was actually issued, all the evidence establishes is that the judge announced her intention to issue a warrant. But respondent's own testimony establishes more; he said that Judge Segarra later recalled the warrant while it was still in the judge's outbox. If the panel's finding is modified to state that Judge Segarra ordered the issuance of a bench warrant, the change would not materially alter the issue before the panel.

Respondent purports to challenge the panel's findings in paragraph 19 regarding his efforts to locate Tony Cruz—the assistant county attorney assigned to R.B.'s case—after R.B. appeared at respondent's office. Specifically, he argues that the findings should have recited that he spoke with other attorneys in the courthouse during his search for Mr. Cruz. The panel's finding as stated is supported by clear and convincing evidence and it is not rendered infirm for failing to include other irrelevant and superfluous facts.

Relying on his own version of events, the respondent takes exception to the panel's finding in paragraph 20 that respondent and his client went to the County Attorney's office and asked to speak with Mr. Cruz; that the front desk attendant asked Mr. Cruz if he could speak with respondent; and that Mr. Cruz responded that he was too busy working on motions to speak with respondent at that time. Respondent complains that the finding fails to stress the urgency with which he communicated his need to speak with Mr. Cruz, albeit the evidence on that point is conflicting. Nevertheless, the inclusion of that point would not affect the outcome of the rules violation analysis. More substantively, he contends that he and his client overheard Mr. Cruz tell his assistant to have respondent call Mr. Cruz later and that the panel incorrectly found that respondent did not inform Mr. Cruz of his intent to return to court on R.B.'s case. The panel had clear and convincing testimony from the assistant and Mr. Cruz to support its finding, notwithstanding respondent's contrary testimony.

In its paragraph 21 finding, the panel quoted the note that respondent sent to Mr. Cruz, via the assistant, after being informed that Mr. Cruz was too busy to see him. We note that the recitation omits the initials "ASAP," after respondent's declaration that "I will surrender him." But respondent does not take exception to that omission, nor does it have a material effect on the analysis. Instead, the respondent challenges the panel's statement that, because Mr. Cruz was working on motions, he did not immediately read the respondent's note. The basis for that challenge is that respondent cannot personally verify whether Mr. Cruz was actually working on motions or when Mr. Cruz read the note. But respondent points to nothing which would refute Mr. Cruz' testimony to support those findings, for whatever relevance those facts might have here.

In paragraph 22, the panel discusses what respondent meant when he stated that he was going to surrender his client. The paragraph accurately characterizes respondent's testimony regarding what he meant when he said he was surrendering his client, and his exception to that finding is simply unavailing.

40

Paragraph 23 relates Mr. Cruz' understanding of what respondent's note meant. Mr. Cruz testified that he understood "surrendering means taking him over to jail." Respondent does not attack the factual accuracy of the panel's finding, but rather his exception complains that the finding implies the respondent had a deceptive intent, when it was simply a matter of a miscommunication. The conclusions to be drawn from the facts will be discussed below.

In paragraph 24, the panel stated that "[u]nbeknownst to Mr. Cruz, the respondent and R.B. returned to Judge Segarra's courtroom," after which the paragraph quotes the transcript of the colloquy between respondent and the judge. Respondent attacks the accuracy of the transcript, and asks us to reweigh the evidence and assess witness credibility. Again, respondent's exception is without merit.

In paragraph 25, the panel quotes extensively from the emails exchanged between respondent and Mr. Cruz following the ex parte hearing at which the judge withdrew the warrant for R.B.'s arrest. While respondent quibbles about the inferences to be drawn from certain statements in the emails, he does not dispute the accuracy with which the communications were quoted. In other words, the finding is supported by clear and convincing evidence.

In paragraph 26, the panel recites the email that Mr. Cruz sent to respondent's supervisor in the Public Defender's office; in paragraph 27, the panel quotes the email that Mr. Cruz sent to Van Printy, who worked in Judge Segarra's chambers. Respondent's exceptions attempt to contradict the content of those emails with respondent's version of events. But that is not the point; the findings accurately describe the content of both emails. The conclusions to be drawn from those accurate facts is a legal question.

41

In paragraph 28, the panel found that respondent had provided the judge with a proposed journal entry reciting that defense counsel had personally informed the prosecution that R.B. intended to surrender himself to the court and request that the newly issued warrant be recalled and the sentencing be rescheduled. The journal entry, prepared and signed by respondent and signed by the judge, further recited that defense counsel had requested the presence of a prosecutor, but none was available. It then stated that R.B. and counsel had appeared before the court "requesting that the Court recall and/or quash the orders announced from the bench approximately an hour earlier." Respondent's exception claims that he did not provide the journal entry to the judge's chambers because he had been fired before the journal entry was delivered.

Respondent's statements regarding the chain of custody of the journal entry he drafted have not all been consistent. Nevertheless, at the least, respondent concedes in his exceptions that he "penned a Journal Entry, then signed and sent the same to Cruz for review on August 21, 2018 [*sic*], and left the signed copy in the Public Defender's Office." The point that the respondent prepared a court order for the judge to sign that did not reflect the actual facts, as the panel found them to be, will be sufficient for our further analysis of the alleged rules violations.

*KRPC 1.6 Client Confidentiality*

Respondent challenges the hearing panel's conclusion that respondent's disclosure to the CSO—either that D.J. cheated on her urinalysis or that D.J. knew how to cheat on a urinalysis—violated KRPC 1.6(a) (2019 Kan. S. Ct. R. 302). Respondent attacks the holding on several fronts, to-wit: (1) The hearing panel misplaced the burden of proof; (2) the formal complaint fails to state sufficient facts that would establish a violation of KRPC 1.6(a); (3) the information respondent disclosed was not "privileged"; if it was, D.J.'s confession to cheating on an earlier drug test authorized respondent to discuss the information; (4) D.J. impliedly authorized the alleged disclosures; (5) Deputy

42

Disciplinary Administrator Kim Knoll misled the panel and withheld documents; and (6) respondent was authorized to disclose the information at issue to prevent D.J. from committing a crime.

Respondent contends that the panel shifted the burden of proof when it required him to establish the existence of an exception that would allow the disclosure of D.J.'s confidential communications. He argues that Supreme Court Rule 211(f) (2019 Kan. S. Ct. R. 257) requires the Disciplinary Administrator to establish misconduct by clear and convincing evidence; therefore, the Disciplinary Administrator must introduce clear and convincing evidence that the client did not authorize a disclosure.

"The ethical requirement of confidentiality is . . . interpreted broadly, with the exceptions being few and narrowly limited." *In re Bryan*, 275 Kan. 202, 222, 61 P.3d 641 (2003). While the burden of proving the KRPC 1.6(a) violation never shifted to the respondent, it was nevertheless up to him to identify an exception upon which he relied. As pointed out in the Disciplinary Administrator's brief, respondent's claim of an exception was a moving target.

Respondent's self-disclosure letter claimed that he disclosed confidential information "to prevent [his] client from committing the felony crime of interference with the judicial process." In a follow-up letter, respondent claimed that he was not revealing confidential information, but rather he was summarizing publicly available information. Later, respondent claimed he revealed the information in order to spare D.J. the indignity of further intrusive body cavity searches prior to urinalysis testing.

The Disciplinary Administrator presented evidence which refuted those claims and supported the panel's conclusion that there was nothing about respondent's disclosure of confidential information that assisted in the representation of D.J. For instance, respondent's disclosure to the CSO on July 27, 2015, would have done nothing to prevent

his client from previously committing a criminal offense by cheating on the May 5, 2015 test, as respondent claims that she did. Further, even if the disclosed information could have been discerned from D.J.'s confession to using drugs, respondent was not free to violate KRPC 1.6(a). See 275 Kan. at 221-24 (duty of confidentiality survives the disclosure of the information through other sources). Moreover, the respondent's claim that the disclosure was necessary to prevent the indignities associated with any further urinalysis testing is undermined by his client's open court offer to submit to another urinalysis the following day.

Respondent's second attack involves the motion to dismiss that he has pending before this court with respect to the Rule 1.6 violation. He claims the formal complaint was insufficient because it failed to specifically allege that D.J. did not authorize him to disclose the confidentialities. That motion is denied. The formal complaint contained the content of the CSO's affidavit, detailing respondent's disclosure of client confidentialities. It also contained the information from respondent's various letters detailing his numerous (and at times seemingly conflicting) rationales for disclosing his conversation with D.J. about cheating or knowing how to cheat on urinalysis tests. The complaint was sufficient to state a claim for the violation of KRPC 1.6.

For his third defense to the KRPC 1.6 violation, respondent argues that D.J.'s confession to court services that she cheated on the urinalysis of May 5 waived the attorney-client privilege. That argument fails on more than one level.

First, under KRPC 1.6 the confidentiality question does not concern a waiver of the attorney-client privilege, which is an evidentiary matter. The exception to the ethical prohibition against revealing client information requires that the client give the attorney consent to disclose the confidentialities after consultation.

44

As a factual matter, as indicated above, D.J. did not confess to having cheated on the May 5 urinalysis test; she only confessed to having consumed drugs beforehand. Indeed, at the disciplinary hearing, the CSO assigned to D.J. testified that she did not know whether D.J. cheated on the May 5 test. Perhaps more importantly, the information that respondent revealed went beyond what could be inferred from the disparate test results on May 5 and 7; the respondent described the manner in which the cheating occurred. But, again, whatever information that court services may have gleaned from other sources, respondent's duty to keep confidential his client's communications survived. See 275 Kan. at 221-24.

Next, respondent argues that D.J. impliedly authorized the disclosures to prevent further invasive searches in conjunction with future urinalyses. The panel weighed the evidence on this point. On the one hand, respondent argued that invasive searches began after the May 7 confession. In contrast, D.J. addressed the court the day *after* respondent's disclosures, and said that her strip search that morning involved indignities "that I've never had to do before," supporting the panel's holding that it was respondent's disclosures that triggered the invasive body searches. In the end, we decline the invitation to reweigh evidence or assess witness credibility.

Next, respondent accuses the Deputy Disciplinary Administrator (DDA) of misleading the hearing panel and withholding documents. Specifically, he complains that the DDA argued to the panel that respondent did not have to reveal client confidences in the first instance in order to seek to have D.J. blood-tested, in lieu of the invasive urinalyses. Rather than being misleading, that argument seems right on point. Respondent could have sought the alternative means of testing through the court or court services without the disclosure. At the least, a client consultation was required before the respondent took the questionable tack.

45

Respondent also complains that the DDA attempted to hoodwink the panel by not introducing the May 5 and May 7 test results. Given that we have rejected respondent's theory of the relevance of those test results, we see no malfeasance here. Moreover, respondent introduced the evidence in his defense, so he suffered no prejudice.

Finally, respondent contends that he was authorized under KRPC 1.6(b) to disclose the client information because he believed D.J. may try to cheat on her July 27, 2015, urinalysis and that would potentially constitute the crime of interference with the judicial process, K.S.A. 2018 Supp. 21-5905(a)(5)(D). Respondent concedes that he has found no Kansas case in which a conviction for that crime was sustained against a defendant who cheated on a urinalysis. Nevertheless, we will assume that such a prosecution is possible.

The panel apparently found that respondent's assertion that he was disclosing a potential crime was incredible, or at least inconsistent with the other reasons given, e.g., to get a different testing method for his client. Moreover, respondent specifically testified before the panel that D.J. never told him that she was cheating on the tests, but only that she knew ways that people cheat on them. In closing argument, respondent told the panel that he did not think any test D.J. submitted after May 5, 2015, was false, but he disclosed the confidential information to stop the strip searches that accompanied the urinalyses.

The exception in KRPC 1.6(b)(1) requires the lawyer to *reasonably believe* that disclosure is necessary to prevent the client from committing a crime. Further, the comments to the rule instruct that the lawyer should first "seek to dissuade the client from illegal action" and that "a disclosure adverse to the client's interest should be no greater than the lawyer reasonably believes necessary to the purpose." KRPC 1.6, comment 13 (2019 Kan. S. Ct. R. 304).

46

In short, respondent's after-the-fact attempt to manufacture an excuse for disclosure of confidential client information is unavailing.

*KRPC 3.3 Candor to the Tribunal*

The panel found that respondent violated his duty to be candid with the court while representing both D.J. and R.B. That duty of candor is set forth in KRPC 3.3 (2019 Kan. S. Ct. R. 350). Subsection (a)(1) directs that a lawyer shall not knowingly make a false statement of fact to the court or fail to correct the lawyer's previous false statement of material fact to the court. Subsection (d) addresses ex parte proceedings and directs that a lawyer must inform the court of all material facts known to the lawyer which will enable the court to make an informed decision, even if the fact(s) are adverse to the lawyer's position.

The allegation with respect to the D.J. representation stems from the respondent's arguments to the court at a status hearing on July 28, 2015, which was the day after respondent disclosed the confidential information to court services. D.J. had again been taken into custody overnight to obtain a urinalysis. The prosecutor recited for the court what had transpired the last time a similar scenario had played out—presumably referring to the May 5 to May 7 situation—and asked the court to order D.J. to submit to one more drug test, "and if it's clean it's clean." The court then related the concerns expressed by court services about D.J.'s erratic behavior and the belief that she might be altering the urinalysis testing or be using a substance that urinalysis testing could not detect. The respondent then presented argument in favor of reinstating D.J.'s bond and proceeding to sentencing, pointing out that D.J. had submitted to urinalysis testing as she had been ordered to do and suggesting that her erratic behavior was caused by anxiety, rather than drug use. In making that argument, the respondent stated:

47

"She's not on drugs. For 16 weeks she has tested clean, she tested clean again. She is—well, she's facing some very serious charges where the sentencing is, and this gal, basically, just came unglued. She's under a lot of stress[,] is acting erratic, rocking back and forth, a lot of these behaviors that they think the etiology is or the allegation of the etiology is drug use, these are behaviors that are just with somebody that's having a difficult time dealing with anxiety."

The panel pointed out that an affidavit filed with the court by D.J.'s supervising CSO asserted that D.J. failed a drug test on May 15, 2015; that the CSO said D.J. admitted using an unknown substance on a spoon on May 7, 2015; and that a substance abuse evaluation, which was filed with the court in June 2015, stated that D.J. had admitted using opioids on May 17, 2015. Because these dates were less than 16 weeks prior to respondent's arguments, the panel found that respondent had been dishonest with the court.

In his exceptions, respondent concedes that he miscalculated the number of weeks D.J. had submitted clean test results. He knew his client tested positive for drugs in mid-May, so his argument should have been that D.J. had been clean just shy of 11 weeks, instead of 16 weeks. But he insists that his miscalculation did not rise to the level of a knowing misrepresentation to the court, as required by KRPC 3.3(a). See *Kline*, 298 Kan. at 125 ("KRPC 3.3[a][1] requires that a lawyer 'knowingly' make a false statement of fact or law."). Moreover, respondent calls our attention to KRPC 3.3, comment 8 (2019 Kan. S. Ct. R. 351-52):

"[8] The prohibition against offering false evidence only applies if the lawyer knows that the evidence is false. A lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact. A lawyer's knowledge that evidence is false, however, can be inferred from the circumstances. See Rule 1.0(e). Thus, although a lawyer should resolve doubts about the veracity of testimony or other evidence in favor of the client, the lawyer cannot ignore an obvious falsehood."

48

The respondent's argument is persuasive. Looking at a calendar and counting the weeks between mid-May and the end of July clearly and convincingly establishes that the period was shorter than 16 weeks. But it is not so clear and convincing that, in the course of advocating for his client during a court hearing, respondent's statement of the number of weeks since his client failed a drug test was a knowing falsehood, rather than a faulty mental calculation during argument.

Further, the materiality of the inaccurate statement is suspect. The point of the argument was that D.J. had experienced a period of sobriety prior to the hearing; 10 weeks of testing clean would have been nearly as compelling as 16 weeks for a drug addict. Moreover, everyone knew of the May 7 test failure and the court should have known about D.J.'s admission to using drugs on May 17 from the evaluation that was filed in June. In other words, the court already had the same information that the panel is using to establish the falsity of the statement that D.J. had tested clean for 16 weeks, i.e., the court did not have to rely on the respondent's argument to do the math.

In sum, we hold that the panel's finding that respondent knowingly violated KRPC 3.3(a) when advocating for D.J. is not supported by clear and convincing evidence.

With respect to his representation of R.B., the panel found that the respondent violated KRPC 3.3(a)(1) by leading the district court to believe that Mr. Cruz had declined to come to court when the respondent appeared with R.B. to get the warrant withdrawn. The panel specifically found that "Mr. Cruz did not decline to come to court; Mr. Cruz did not know the respondent was returning to court." As set forth above, the panel's findings in that regard were supported by the testimony of Mr. Cruz and his assistant which constituted clear and convincing evidence. Respondent's invitation for us to substitute our findings for that of the panel is unavailing.

49

The misrepresentation before the judge would be sufficient to establish the candor to the tribunal violation. But, in addition, respondent drafted a journal entry containing false information. He defends that act by asserting that there is no evidence that he personally provided the journal entry to the court to be signed. Nevertheless, the evidence does clearly establish that respondent prepared the journal entry with the intent that it represented the court's order for the August 20, 2015 hearing, and that the journal entry contained false information. We uphold the panel's finding of a violation of KRPC 3.3(a)(1).

The panel found respondent violated KRPC 3.3(d) at the ex parte hearing on August 20, 2015, by failing to inform the district court of all material facts known to the respondent. Specifically, the panel found that respondent failed to tell the court that he had not spoken with Mr. Cruz and that he did not know whether Mr. Cruz would object to the court's recalling R.B.'s arrest warrant. None of respondent's exceptions call into question the fact that respondent failed to disclose that specific information to the court. Moreover, the circumstances make those facts material in this case. The respondent engaged the court in an ex parte proceeding, seeking a reversal of an order that was entered earlier in the day at a hearing in which Mr. Cruz participated. Whether respondent had spoken with opposing counsel about revisiting the issue and whether opposing counsel objected to a reversal of the prior court order were material facts the judge needed in order to properly decide whether to enter the ex parte order withdrawing the warrant. We uphold the panel's finding of a violation of KRPC 3.3(d).

*KRPC 8.4(c) and (d) Professional Misconduct*

KRPC 8.4(c) (2019 Kan. S. Ct. R. 387) makes it professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation"; KRPC 8.4(d) (2019 Kan. S. Ct. R. 387) makes it professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." The panel found a

Rule 8.4(c) violation based on respondent's conduct involving dishonesty when he: (1) told the court that D.J. had not been using drugs and had tested clean for 16 weeks; (2) told the court Mr. Cruz declined to come to court in R.B.'s case; and (3) drafted a journal entry in R.B.'s case which stated that he had personally informed the prosecution that R.B. intended to surrender to the court, request a withdrawal of the newly issued warrant, and request that the sentencing be rescheduled. It found a Rule 8.4(d) violation based on respondent "submit[ing] a journal entry which contained inaccurate and false information."

The Disciplinary Administrator argues that respondent failed to fully brief the issues on Rule 8.4 and, therefore, we should deem these challenges abandoned. Cf. *In re Johanning*, 292 Kan. 477, 486, 254 P.3d 545 (2011) ("By not arguing the other exceptions he had raised, the respondent has abandoned those exceptions."). That abandonment argument is not so straightforward, however. As noted above, the panel based the Rule 8.4 violations on the very same facts that formed the basis for the Rule 3.3 violations and the panel did not provide further discussion on those points. As respondent stated in his brief: "The Final Hearing Report determined that Respondent committed violations of Rule 1.6(a) and 3.3(a), and that these violations were rooted in dishonesty and therefore contrary to KRPC 8.4(a)." Respondent then addressed the idea that the same conduct should not be repurposed for another rules violation, arguing that: "Because Respondent acted in good faith, with zeal, passion, and integrity, this Court should find that Respondent did not violate KRPC 8.4." Consequently, respondent's extensive briefing on the facts underlying the Rule 3.3 violations was sufficient to avoid an abandonment of his challenge to the use of the same facts as the basis for the 8.4 violation.

Nevertheless, the clear and convincing evidence established that respondent engaged in conduct involving dishonesty and misrepresentation with respect to his handling of the August 20, 2015 ex parte hearing in R.B.'s case. He told the judge that the

prosecutor "declined to come here today, saying . . . if you can get me on the phone, fine[.]" Even respondent's version of what transpired at Mr. Cruz' office belies that statement. Moreover, respondent represented to the court that the prosecutor would not object "to just resetting the matter," when there was no basis in fact to support such a belief. In sum, the panel's conclusion that respondent violated KRPC 8.4(c) is adequately supported.

The journal entry memorializing the August 20, 2015 ex parte hearing was signed by the respondent as the preparer and executed by the district court judge. That order recites that "[d]efense counsel reported that he personally informed the prosecution that [R.B.] intends to surrender himself to the Court and request that the newly-issued warrant be recalled and sentencing rescheduled. Although defense counsel requested a prosecutor to be present for an impromptu hearing, none was available." The panel found that the facts refuted the truth and accuracy of that statement. Ironically, respondent impliedly acknowledges the impact the journal entry had on the administration of justice when he argues in his brief that the Disciplinary Administrator's office is barred by the principle of issue preclusion from collaterally attacking his allegation that he personally informed the prosecution of his intentions because the judge made that factual finding in her order. In other words, respondent argued that because the judge signed the journal entry containing false information, the falsities now have the force of law that cannot be collaterally attacked. That argument proves the point that drafting a journal entry the lawyer knows contains inaccurate and false information with the intention that it be submitted to the court for signature is conduct prejudicial to the administration of justice, in violation of KRPC 8.4(d).

*Conclusion on Violations*

To summarize, we affirm the panel's determination that respondent violated KRPC 1.6(a) when he revealed confidential client information to the court services officers in

D.J.'s case. We hold that respondent did not knowingly violate KRPC 3.3(a)(1) when advocating for D.J., but he violated both KRPC 3.3(a)(1) and (d) when advocating for R.B. Finally, we affirm the panel's determination that respondent violated KRPC 8.4(c) and (d).

*Appropriate Discipline*

Before the hearing panel and in its brief to this court, the office of the Disciplinary Administrator recommended that respondent be disbarred. At oral argument, however, the DDA acknowledged that there had been no exceptions filed to the panel's determination that respondent had engaged in "knowing" conduct, not "intentional" conduct. Consequently, the office of the Disciplinary Administrator amended its position to recommend the respondent be indefinitely suspended.

Prior to the Disciplinary Administrator filing its formal complaint, respondent filed a proposed probation plan. But at the panel hearing, respondent had not put his probation plan into effect. See Supreme Court Rule 211(g)(2) (2019 Kan. S. Ct. R. 257) (respondent shall put probation plan into effect prior to hearing on formal complaint). Further, respondent argued that probation was unnecessary and would not be very helpful, albeit he indicated that he would be willing to enter into a diversion or probation agreement, if required to do so. Instead, respondent requested that he be given an admonition or reprimand.

As noted above, the hearing panel recommended that respondent be suspended from the practice of law for a period of 30 days.

This court is not bound by the sanction recommendations made by the Disciplinary Administrator. Likewise, a hearing panel's recommendations and the reasons therefor are advisory only. See *In re Davisson*, 308 Kan. 271, 283, 419 P.3d 599 (2018);

Supreme Court Rule 212(f) (2019 Kan. S. Ct. R. 261). This court has a duty to examine all of the evidence and make an independent judgment on the discipline to be imposed. See *In re Wenger*, 279 Kan. 895, 909, 112 P.3d 199 (2005).

As the panel opined, respondent's misconduct in this case is serious. Safeguarding a client's confidences and being candid with the tribunal before which the attorney is advocating are fundamental concepts and are essential to the continued viability of our criminal justice system. Consequently, all members of the court agree with the panel's assessment that "some time away from the practice of law would benefit the respondent as well as the citizens of the State of Kansas," albeit we do not discern that 30 days is sufficient for that purpose. On the other hand, the apparent absence of any selfish motive on respondent's part counsel against imposing one of our most severe sanctions. Therefore, a majority of the court votes to suspend respondent from the practice of law for a period of 60 days. A minority of the court would have imposed a longer period of suspension. This court unanimously rejects respondent's contention that he should not be held liable for the costs herein incurred.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that David E. Herron II, be and is hereby disciplined by suspension from the practice of law for 60 days in accordance with Supreme Court Rule 203(a)(2) (2019 Kan. S. Ct. R. 240).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

LUCKERT, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 119,726 vice Justice Luckert under the authority vested in the Supreme Court by K.S.A. 20-2616.